UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

THOMAS G. WILLIAMS,          )
                             )
          Petitioner,        )
                             )
v.                           )     Nos.:   2:11-cv-276; 2:09-cr-54(2)
                             )     *Judge Greer*
                             )
UNITED STATES OF AMERICA,    )
                             )
          Respondent.        )

## MEMORANDUM OPINION

Acting *pro se*, federal inmate Thomas G. Williams ("petitioner" or "Williams") has filed a motion to vacate, set aside, or correct a sentence under 28 U.S.C. § 2255 and a supplemental § 2255 motion, [Docs. 761 and 798].[1]  Petitioner pled guilty to and was convicted of conducting a racketeering enterprise, in violation of 18 U.S.C. § 1962.  For this offense, Williams received a 96-month term of imprisonment.   In his motions, petitioner offers claims of ineffective assistance of counsel, abuse of discretion on the part of this Court, sentencing disparities, and prosecutorial misconduct, as grounds for relief.   The United States has filed a response in opposition to the motions, [Doc. 850]. The Court has determined that the files and records of the case conclusively establish that Williams is not entitled to relief under § 2255 and that, therefore, no evidentiary hearing is necessary.   For the reasons which follow, petitioner's § 2255 motions will be **DENIED**.

---

[1] The racketeering offense alleged in Count 1 against Williams and three co-defendants involved the operation of a chop shop, altering ID numbers on motor vehicles and motor vehicle parts and trafficking in those vehicles and vehicular parts, defrauding insurance companies with claims involving purportedly stolen vehicles, and unlawfully distributing controlled substances, [Doc. 3].

# I.  Procedural Background

Williams was charged, along with twenty-two co-defendants, in a thirty-six count indictment returned by the federal grand jury on June 9, 2009, [Doc. 3].  Twenty-four of those counts (i.e., 1, 2, 3, 4, 5, 10-11, 15-16, 18-24, and 28-35), alleged that Williams engaged in racketeering, operated a chop shop, trafficked in motor vehicle parts with altered vehicle identification numbers, and conspired to distribute cocaine and marijuana, stolen vehicle property, and mail fraud.

On March 3, 2010, Williams pled guilty [Doc. 358], pursuant to a plea agreement with the government, to Count 1 of the indictment, which charged him with the racketeering offense, [Doc. 342].[2]  In the plea agreement, petitioner agreed to waive his right to file a direct appeal except for "a sentence imposed above the sentencing guideline range or any applicable mandatory minimum sentence (whichever is greater)" and likewise to waive his right "to file any motions or pleadings pursuant to 28 U.S.C. § 2255" except for "claims of ineffective assistance of counsel and prosecutorial misconduct not known to [petitioner] at the time of entry of judgment," [*Id.* at 17].

A presentence investigation report (hereinafter "PSR") was prepared.  Using the 2009 version of the United States Sentencing Commission Guidelines Manual, the probation officer calculated a base offense level of 8 for the chop-shop conspiracy, with a 16-level increase based on the amount of loss (more than $1,000,000 but less than $2,500,000) and another 4-level increase for petitioner's leadership role in the offense, *see* USSG § 3B1.1(a).  The resulting adjusted offense level was 28.[3]

---

[2]  The racketeering offense alleged in Count 1 against Williams and three co-defendants involved the operation of a chop shop, altering ID numbers on motor vehicles and motor vehicle parts and trafficking in those vehicles and vehicular parts, defrauding insurance companies with claims involving purportedly stolen vehicles, and unlawfully distributing controlled substances, [Doc. 3].

[3] Under USSG § 1B1.2(d), where the offense of conviction is a conspiracy to commit more than one offense, the

The base level offense for the conspiracy to distribute cocaine and marijuana, given that the lowest amount of cocaine was pegged at 500 grams and the lowest quantity of marijuana at 2.5 kilograms, was calculated to be 26. The adjusted offense level remained 26, since there were no applicable adjustments. After increasing by two units the greater of the adjusted offense levels (28 for the chop-shop is > 26 for the drug conspiracy), the probation officer found the combined adjusted offense level to be 30, (28 + 2 = 30). However, deducting three levels for acceptance of responsibility, pursuant to USSG § 3E1.1(a) and (b), resulted in a total offense level of 27. An assessment of nine criminal history points established a criminal history category of IV. A criminal history category of IV and a total offense level of 27 resulted in a guidelines range of 100-125 months' imprisonment. Restitution, which was required by statute and by the guidelines, *see* 18 U.S.C. § 3663A(a)(1); USSG § 5E1.1(a)(1), was calculated to be $919,335.34.

The government filed a motion for downward departure, under USSG § 5K1.1, based on petitioner's substantial assistance, [Doc. 550]. On January 25, 2011, the Court granted the motion for downward departure, departed downward two levels, and sentenced Williams to 96 months of imprisonment—the middle of his new guidelines sentencing range (84-105 months)—as recommended by the government, [Doc. 849, Sent. Tr. at 36-37]. Pursuant to the terms of the plea agreement, the remaining counts in the indictment were dismissed at sentencing. Judgment was entered on February 16, 2011, imposing a sentence of 96 months imprisonment, to be followed by three years of supervised release, [Doc. 728]. No direct appeal was filed and petitioner timely filed this § 2255 motion on September 26, 2011.

## II. Standard of Review

---

conviction is treated as though a defendant was convicted of a separate count of conspiracy for each offense. In this case, petitioner's conviction for Conducting a Racketeering Enterprise encompassed the illegal activity of operation of a chop shop and distribution of controlled substances.

Title 28 United States Code section 2255(a) provides that a federal prisoner may make a motion to vacate, set aside, or correct his judgment of conviction and sentence on the ground that the sentence was imposed in violation of the Constitution or laws of the United States, that the court lacked jurisdiction to impose the sentence, or that the sentence is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. As a threshold standard, to obtain post-conviction relief under § 2255 a motion must allege: (1) an error of constitutional magnitude; (2) a sentence imposed outside the federal statutory limits; or (3) an error of fact or law so fundamental as to render the entire criminal proceeding invalid. *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003); *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).

Petitioner bears the burden of demonstrating an error of constitutional magnitude which had a substantial and injurious effect or influence on the criminal proceedings. *Reed v. Farley*, 512 U.S. 339, 353 (1994); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

Under Rule 8 of the Rules Governing Section 2255 Proceedings in the United States District Courts, a court is to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. If the motion to vacate, the answer, and the records of the case show conclusively that the petitioner is not entitled to relief under § 2255, there is no need for an evidentiary hearing. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986). The Court **FINDS** no need for an evidentiary hearing in the instant case.

### III.  Factual Background

At the time of his guilty plea, Williams stipulated to the following facts, taken from the plea agreement filed in this case:

#### The Racketeering Enterprise

4

At various times relevant to the Indictment, Raymond Eddie Hawk, Thomas Grant Williams, James Alfred Sisk, Eric Scott Williams, and others known and unknown, including H-1 Auto, later known as A Automotive, an automobile recycling and salvage business located in Newport, Tennessee, were members and associates of an enterprise (hereinafter the "Hawk Organization") where members and associates engaged in illegal activity, to include operation of a chop shop, altering identification numbers on motor vehicles and motor vehicle parts, trafficking in motor vehicles and motor vehicle parts with altered identification numbers, devising and executing schemes to defraud insurance companies involving claims for purportedly stolen vehicles, and unlawfully distributing controlled substances, and which operated principally in Cocke County, Tennessee, in the Eastern District of Tennessee.

The Hawk Organization, including its leadership, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereafter "enterprise"), that is, a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

The purposes of the enterprise included: enriching the members and associates of the enterprise through, among other things, the operation of a chop shop, transporting stolen motor vehicles across state lines and receiving such stolen vehicles, transporting stolen property across state lines and receiving such stolen property, altering identification numbers on motor vehicles and motor vehicle parts, trafficking in motor vehicles and motor vehicle parts with altered identification numbers, devising and executing schemes to defraud insurance companies involving claims for purportedly stolen vehicles, and unlawfully distributing controlled substances.

In general, the Hawk Organization was a coalition of persons involved in the operation of a chop shop and motor vehicle thefts and related activities acting under the direction of Raymond Hawk and Grant Williams. Hawk and Grant Williams would obtain salvage motor vehicles from salvage dealers, usually late model pickup trucks and sport utility vehicles (SUVs), and then direct others to steal or participate in stealing vehicles matching the salvage vehicles. Eric Williams, brother of Grant Williams, and James Sisk generally acted under the direction of Hawk and Grant Williams.

Among the means and methods by which Hawk, Grant Williams, James Sisk, Eric Williams, and their associates conducted

and participated in the conduct of the affairs of the enterprise were the following:

a. Members of the enterprise and their associates would steal motor vehicles; disassemble the stolen motor vehicles; alter, obliterate and tamper with identification numbers on the stolen motor vehicles and motor vehicle parts; construct motor vehicles from parts of stolen motor vehicles bearing altered or obliterated identification numbers; and sell and dispose of motor vehicles and motor vehicle parts bearing altered identification numbers.

b. Members of the enterprise and their associates would devise schemes to defraud insurance companies on claims for thefts of motor vehicles by arranging with the owners of motor vehicles to take the motor vehicle with the owner then filing a false claim for the theft of the motor vehicle and the members of the enterprise receiving the purportedly stolen motor vehicle to dispose of as described in subparagraph (a) above.

c. Members of the enterprise and their associates would distribute and conspire to unlawfully distribute controlled substances, to include cocaine and marijuana.

d. Members of the enterprise and their associates promoted a climate of fear through violence and threats of violence.

e. Members of the enterprise and their associates used persons within the local law enforcement community to aid in the concealment of the enterprise's operation and to protect the enterprise's criminal operations.

**Operation of the Chop Shop and VIN Altering**

As noted above, Ray Hawk operated an auto salvage business under the name H-1 Auto Parts at 120 Willis Road, Newport, Tennessee until sometime in late 2004. The business was engaged in the sale of used automobiles and automobile parts. Hawk briefly sold the business around 2004-2005 but resumed operations under the name A Automotive and with his daughter Rebecca Nicole Hawk as the reported owner of the business in late 2007. H-1 Auto, and later A Automotive, sold used auto parts throughout the United States both through Car-Part.com, an Internet used auto parts locator and sales service operating from Fort Wright, Kentucky, and later through its own Internet web-site, www.AAutoTN.com (hosted by Car-Part.com). Legitimate auto salvage businesses obtain salvage automobiles through salvage wholesalers who usually obtain them from insurance companies. The auto salvage and used parts

6

businesses will then disassemble the automobile to obtain any parts which may be resold.

In addition to the sale of legitimate salvage vehicles and parts, H-1/ A Automotive was also a "chop shop," that is, Hawk, with the assistance of Grant Williams, James Sisk, Eric Williams, Curtis Reed, Doyle Maloy, Nicole Hawk, Darrell Burgin, Denise Brown, and others, would obtain stolen motor vehicles, usually late model pickup trucks and sport utility vehicles, and dismantle the stolen vehicles at the Willis Road location and other locations.

Parts bearing vehicle identification numbers (VINs), such as engines, transmissions, and doors, would have the VINs altered or obliterated to prevent identifying the parts as having come from a stolen vehicle. The stolen parts with altered VINs would then be sold in interstate commerce through H-1/A Automotive. Other stolen parts would be used to construct vehicles bearing the public VINs of a salvage vehicle, a practice known as a "salvage switch" or "VIN swap." These vehicles bearing the altered VINs would then be sold.

**RICO Predicate Act Two - Obstruction of Justice**

On December 15, 2003, a Tennessee Highway Patrol (THP) Criminal Investigation Division (CID) special agent, who was assisting the Federal Bureau of Investigation (FBI) in an ongoing investigation in Cocke County, along with a Cocke County Sheriff's Office (CCSO) detective and another local detective received information from a Newport Police Department officer that a possibly stolen vehicle was parked at Shoemaker's Florist there in Newport. The officers located the vehicle and observed that the public VIN plate appeared to have been tampered with. Grant Williams approached the officers and eventually promised to take the vehicle to the CCSO for inspection. When Williams did not appear at the CCSO as promised, the officers returned to Shoemaker's Florist. Grant Williams then told the officers that he would not permit them to inspect the vehicle without a search warrant. Williams' father, Newport Police Department Captain Milburn Williams, arrived, spoke briefly to Grant Williams, and then told the officers they were not going to look at the truck without a warrant and to leave. The THP agent told Captain Williams that they would obtain a search warrant and return, but would have to leave an officer there to secure the vehicle. Captain Williams told them that would not be necessary and that he would personally assure the officers that the vehicle would be there when the officers returned. Captain Williams then again asked the officers to leave. The officers obtained a state search warrant. When they returned to Shoemaker's Florist, the gate was locked and the vehicle was gone. The officers returned to the CCSO. Captain Williams came to the CCSO a short time later. He was told

that the officers had obtained a warrant but the vehicle was gone. Captain Williams said, "I was afraid that would happen" and then went on to say "I figured something was wrong with it." Captain Williams was urged to contact his son to bring the vehicle in. After talking to his son, Captain Williams agreed to take the officers to Grant Williams' residence at 363 New Cave Church Road in Newport. When the officers arrived, Grant Williams met them outside. Grant Williams told the officers that the vehicle was not there and that he had loaned it to a friend to take bear hunting. When the officers asked who the friend was, Grant Williams said he would not give the officers the friend's name. Captain Williams then told the officers to leave. The vehicle was never recovered.

**RICO Predicate Act Three - Interstate Transportation of Stolen Motor Vehicle and**

**Possession of Motor Vehicle Parts with Altered Identification Numbers**

On February 11, 2004, a CCSO detective received information that an individual had arranged for his truck to be stolen from a shopping center parking lot in Newport, Tennessee, as part of an insurance fraud scheme. The detective located the truck, a 1999 Chevrolet Z-71 four-wheel drive extended cab pickup truck, and observed that a single key was in the ignition. The detective began watching the truck. Eric Williams was dropped off by Doyle Maloy in another truck beside the truck to be stolen. Eric Williams entered the truck and drove off with Maloy following in the other truck. The detective followed the two vehicles until he observed them turn up the driveway to the residence and garage of Ray Hawk at 1318 Cactus Way, Newport, Tennessee. A short while later, Eric Williams and Maloy left the residence in the other truck, indicating the "stolen" truck was still at the residence.

After contacting the owner of the "stolen" truck and being advised the truck was purportedly stolen, officers obtained a state search warrant for 1318 Cactus Way. In a garage at the residence, officers located parts from a 1994 Ford F-350 truck with a flat bed which had been stolen from Power Equipment Company, Kingsport, Tennessee on February 6, 2004. The steering column on the F-350 had been "peeled" with the ignition lock removed and a pair of locking pliers was on the column to be used to start the truck. Officers also located parts, to include a dash panel with the VIN plate removed, a wiring harness, and a tail gate which were identified as having come from a 2003 Chevrolet Avalanche truck, VIN 3GNEK13T83G158153, which had been stolen in Asheville, North Carolina on December 22, 2003 by Grant and Eric Williams. The parts had already had markings put on them apparently for the parts

to be placed in inventory at H-1 Auto. Officers subsequently found the public VIN plate for the Avalanche in a bedroom at 1318 Cactus Way.

**RICO Predicate Act Four; Count 4 - Interstate Transportation of Stolen Motor Vehicle and Arson**

On the evening of May 12, 2005, a U.S. Forest Service (USFS) law enforcement officer (LEO) was requested by the USFS to respond to a woods fire set in Haywood County, North Carolina in the remote Harmen Den/Brown Gap area of the Pisgah National Forest. Investigation revealed the fire began as the result of a stolen vehicle being abandoned and set on fire on a pull off road just adjacent to the National Forest roadway. The vehicle that had been set on fire was determined to be a Chevrolet SUV, green in color. The hood was missing from the truck but no other parts appeared to be missing. The vehicle was burned beyond repair. With the assistance of the North Carolina Division of Motor Vehicle Enforcement, the vehicle was identified as a 1997 Chevrolet Suburban was stolen on the evening of September 7, 2004 from Knoxville Center Mall. Further investigation determined that Grant Williams and others had stolen the vehicle and had transported it to the National Forest where it had been set on fire.

**RICO Predicate Act Five - Possession of Motor Vehicle Parts Bearing Altered Identification Numbers With Intent to Sell or Dispose**

On June 15, 2005, a federal search warrant was executed at the residence of Grant Williams at 363 New Cave Church Road, Newport, Tennessee. Evidence recovered included two-way radios, binoculars, several license plates, auto burglary tools, car parts consistent with the operation of a "chop shop," a GMC V8 Vortec engine with the serial number ground off, a Haulmark 5' x 10" trailer from which the serial number had been removed, and a Homelite generator from which the serial number had been removed. A quantity of illegal drugs was also recovered. FBI agents observed a jacket in a closet which was one of the items from purportedly stolen merchandise which had been delivered by an FBI undercover agent to CCSO Deputy Joe Dodgin and Chief Deputy Pat Taylor in May 2005.

**RICO Predicate Act Seven - Possession of Motor Vehicle Parts Bearing Altered Identification Numbers With Intent to Sell or Dispose**

On April 25, 2007, FBI special agents, assisted by THP-CID agents, executed a federal search warrant at the residence of Grant

Williams at 363 New Cave Church Road, Newport, Tennessee. Agents recovered two automobile transmissions and a transfer case from which the identification numbers had been altered, obliterated, or removed. Agents also observed a white GMC truck bearing the public VIN (on the dashboard) of 2GTEK13T541345921 in Williams' garage. The truck could not be positively identified at that time as having been stolen, having altered identification numbers, or otherwise constituting contraband or evidence of a crime. However, a THP-CID agent did record identifying information from a motor vehicle part on the truck during the authorized search.

After consulting with the National Insurance Crime Bureau (NICB), the THP-CID agent determined that the motor vehicle part which he had examined had originally been installed on a white 2004 GMC Sierra pickup truck which had been stolen in Knoxville, Tennessee on the afternoon of February 13, 2007 from Knoxville Center Mall. The vehicle was subsequently seized and a more comprehensive inspection of the truck revealed that identification numbers on the frame rails of the truck had been altered, obliterated, and tampered with. The public VIN which appeared on the seized truck was for a salvage 2004 GMC Sierra truck which Grant Williams had purchased from a Kentucky salvage dealer in February 2007. The Kentucky salvage dealer also applied for a "rebuilt" title in Kentucky for Grant Williams which allowed Williams to later apply for a Tennessee title without having the truck inspected by Tennessee authorities.

**RICO Predicate Act Nine - Mail Fraud and Possession of Motor Vehicle Bearing Altered Identification Numbers With Intent to Sell or Dispose**

Felicia Stewart purchased a new 2006 Nissan Altima, dark blue in color, in May 2006 at East Tennessee Nissan in Morristown, Tennessee; the purchase was financed by a loan from Lowland Credit Union, who secured a lien on the vehicle for the loan. While the car was registered and titled in Felicia Stewart's name, the named insured on the policy with State Farm Mutual Automobile Insurance Company ("State Farm") was "Terrence L. Stewart," Stewart's then 17 year old son.

Records of Lowland Credit Union reflect that at the time of the purported theft in July 2008, Felicia Stewart owed LCU over $50,000 on two auto loans and was making monthly payments totaling $1,377. Stewart reported her gross monthly income as only $2,000.

On July 14, 2008, Felicia Stewart reported to the Sevierville, Tennessee Police Department that her 2006 Nissan Altima had been

stolen from a restaurant parking lot in Sevierville. Stewart claimed that the car had been stolen while she and her mother were in a restaurant. In fact, Stewart had arranged with Raymond Hawk to take the car so that Stewart could falsely report it as stolen. Stewart and Hawk had spoken by cellular telephone before Stewart entered the restaurant to advise Hawk where the car could be found.

On August 11, 2008, Felicia Stewart completed an "Affidavit of Vehicle Theft" which was faxed from a State Farm agent's office in Dandridge, Tennessee to the State Farm office in Murfreesboro, Tennessee later that day.

On August 15, 2008, the State Farm office in Murfreesboro, Tennessee issued a check in the amount of $20,545.32 payable to Lowland Credit Union in settlement of the claim. The check was mailed by US mail to Lowland Credit Union in Newport, Tennessee for them to release the lien and mail the title back to the Murfreesboro office. The original title was received back by US mail at State Farm on August 26, 2008.

Further investigation revealed that Ray Hawk, Grant Williams, and others performed a "salvage switch" on the purportedly stolen 2006 Nissan Altima, replacing the public vehicle identification number (VIN) on the 2006 Altima with the VIN plate from a salvage 2005 Nissan Altima. The vehicle appearing to be the 2005 Nissan Altima was seized pursuant to judicial authorization on March 25, 2009 from persons who had received the vehicle from Grant Williams. The vehicle was determined to be a "salvage switch" using the public VIN of the salvage vehicle but was identified through confidential VINs as the 2006 Nissan Altima reported stolen by Stewart in July 2008. Additionally, an air bag seized from A Automotive, Ray Hawk's auto salvage business in Newport, Tennessee, pursuant to a federal search warrant on March 23, 2009 was subsequently identified as having been an airbag installed in Felicia Stewart's 2006 Nissan Altima.

**RICO Predicate Act Eleven - Mail Fraud**

On Sunday, October 5, 2008, Brian Askew reported to Knoxville Police Department's Teleserve desk that his 2001 GMC Yukon had been stolen from a parking lot at Knoxville Center Mall earlier that afternoon. Askew told a KPD officer that he entered the mall and when he came out about an hour later his truck was gone. Askew reported there was no broken glass in the parking space.

Askew reported the theft to his insurance company, Tennessee Farmers Mutual Insurance Company ("TFMIC"), the following day. At the time of the theft, the vehicle had a lien from

AmSouth Bank (now Regions Bank) for a purchase money loan. The vehicle was titled in the names of both Brian D. Askew and his wife, and Askew owed more on the loan than the truck than the truck was worth.

On December 4, 2008, TFMIC issued a check in the amount of $11,908.25 made payable to Brian D. Askew and Regions Bank in settlement of the claim and mailed the check by United States mail to Regions Bank in Birmingham, Alabama. The reverse of the check reflects it was negotiated by Regions Bank.

In fact, Askew and Grant Williams had devised a plan in late August 2008 to dispose of Askew's vehicle and falsely report it as stolen after Askew's wife had purchased a new 2008 Chevrolet Suburban. Williams took possession of Askew's Yukon in September 2008 and disassembled it for parts. Askew then falsely reported the vehicle as stolen on October 5, 2008.

**RICO Predicate Act Twelve - Possession of Motor Vehicle Parts Bearing Altered Identification Numbers With Intent to Sell or Dispose**

On February 4, 2009, FBI special agents, along with THP-CID special agents and other state and local law enforcement officers, executed a federal search warrant at the residence of Grant Williams at 363 New Cave Church Road, Newport, Tennessee. The warrant authorized the agents and officers to search for evidence of drug violations. During the execution of that search warrant and while looking at motor vehicle titles and registrations to identify evidence of proceeds of drug sales, agents observed a motor vehicle registration for a Chevrolet Tahoe. Agents observed that the mileage reported on the registration document was 73,701 miles. However, when observing the Chevrolet Tahoe that was there at the residence, agents observed that the odometer reflected mileage of 60,830 miles. The vehicle appeared to be a 2004 Chevrolet Tahoe. Agents also observed a red pickup truck that appeared to be a 2005 Chevrolet truck, SC1 version. The driver's side door sticker which bears the public VIN had been removed. Agents also observed the partial front clips from motor vehicles in the woods beside the house along with two motor vehicle transmissions where the identification numbers had been broken off the bell housings.

FBI agents subsequently obtained a second search warrant for motor vehicle theft related evidence and seized the 2004 Chevrolet Tahoe and the 2005 Chevrolet truck. The Chevrolet truck was subsequently identified as a 2007 Chevrolet Silverado truck stolen from the parking lot of Sears at Knoxville Center Mall. The salvage 2005 Chevrolet truck whose public VIN and title was used for the

12

salvage switch had been sold to Grant Williams by South Laurel Auto Sales, London, Kentucky on September 15, 2007 for $2,500.

**RICO Predicate Act Thirteen - Possession of Motor Vehicle Parts Bearing Altered Identification Numbers With Intent to Sell or Dispose**

On September 13, 2008, Grant Williams and others stole a 2005 Chevrolet Tahoe from the vicinity of West Town Mall, Knoxville, Tennessee. Grant Williams had acquired a salvage 2004 Chevrolet Tahoe from a South Shore, Kentucky auto salvage dealer in late August 2008. Grant Williams then enlisted the assistance of others to accomplish the "salvage switch" of the VINs on the salvage Tahoe to the stolen Tahoe. FBI and THP-CID agents seized the "salvage switch" vehicle on February 4, 2009 and subsequently identified the vehicle as being the vehicle stolen from Knoxville in September 2008.

**RICO Predicate Act Fourteen; Count 23 - Interstate Transportation of Stolen Motor Vehicle**

On March 7, 2009, Grant Williams, accompanied by Timothy Chrisman, traveled from Newport, Tennessee to Knoxville, Tennessee to steal a late model General Motors truck or sport utility vehicle to deliver to an individual in southwest Virginia. Between 5:00 and 6:00 p.m. that day, Williams and Chrisman stole a black 2003 GMC Yukon from the parking lot of a J.C. Penney store at Turkey Creek in west Knoxville, Tennessee. Chrisman then drove the stolen truck, with Williams following in a separate vehicle, from Knoxville to Newport, Tennessee and then to Weber City, Virginia. In a transaction surveilled by an FBI special agent, Williams delivered the stolen SUV to a third person at an Exxon station in Weber City.

The parties agree that the amount of loss, for purposes of application of U.S.S.G. § 2B1.1(b)(1), made applicable by U.S.S.G. § 2E1.1(a)(2), resulting from the above conduct during the period of Williams' involvement was more than $1,000,000 but not more than $2,500,000.

**RICO Predicate Act Fifteen - Conspiracy to Distribute Cocaine**

From at least 2002 and continuing through at least February 2009, both dates being approximate and inclusive, in the Eastern District of Tennessee, Grant Williams knowingly and intentionally conspired with James Sisk, Raymond Hawk, Nicole Hawk, Kalep Haney, Jose Cabrera, Roger Miller, Gerald Jones, Calvin Ivey, Margie Barnes, Kimberly Atkins, and others to distribute and possess

with the intent to distribute five hundred grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance.

In furtherance of the conspiracy, Williams obtained quantities of cocaine from Raymond Hawk and later from Jose Cabrera, Kalep Haney, and others. Grant Williams would then distribute cocaine himself as well as supplying Miller, Jones, Ivey, Barnes and others with cocaine which they were distributing. Sisk would obtain quantities of cocaine from Jose Cabrera which Sisk would then deliver to Grant Williams for distribution. On January 27, 2009, Sisk drove from A Automotive to meet with Cabrera at the Wal-mart parking lot in Newport where Cabrera delivered a quantity of cocaine to Sisk. Sisk paid Cabrera for the cocaine and subsequently delivered the cocaine to Grant Williams.

The parties agree, for the purposes of the application of U.S.S.G. § 2D1.1(a)(5), made applicable by U.S.S.G. § 2E1.1(a)(2), Williams was involved in the distribution of at least five hundred grams but not more than 2 kilograms of cocaine.

### RICO Predicate Act Sixteen - Conspiracy to Distribute Marijuana

In addition to trafficking in cocaine, Grant Williams was being supplied quantities of marijuana by Joshua Burgin and others which Grant Williams was distributing to and redistributed by Ray Hawk, James Sisk, Eric Williams, Nicole Hawk, Kalep Haney, and others.

[Doc. 3, Plea Agreement at 2-11].

### IV.    Analysis and Discussion

In his motion, petitioner asserts five claims of ineffective assistance of counsel.  In his supplement, as the Court understands his allegations, he alleges at least a dozen more, although he incorporates throughout the second pleading iterations of the ineffective assistance claims offered in the first. Among counsel's alleged shortcomings are his failures to investigate the loss amount, to provide petitioner with discovery, to explain the waiver of appellate rights, to consult with him, to explain the charges, to negotiate with the Assistant U.S. Attorney, to visit him more, to meet to discuss sentencing issues prior to sentencing, to advise the Court of petitioner's

14

mother's ill health, to advise petitioner concerning the restitution amount, and to argue petitioner's indigence as a factor to consider in setting the restitution amount. Further, counsel is charged with having petitioner sign a plea agreement containing an incorrect loss amount. The supplement also includes contentions that the Court made several errors and that the prosecutor committed acts of misconduct—all of which center on the incorrect loss amount involved in Williams's chop-shop guidelines sentencing calculations.

The United States argues, in its response, that Williams's claims are unreviewable due his procedural default or waiver of those claims. More specifically, the government maintains petitioner failed to raise certain claims on direct appeal, which constitutes a procedural default of those claims. As to claims of ineffective assistance which typically are brought in a collateral review proceeding, respondent relies on the plea agreement provision containing an explicit waiver of petitioner's right to file any pleading under § 2255, except for claims of ineffective assistance of counsel (or prosecutorial misconduct) unknown to him by the time his judgment was entered. None of the ineffective assistance claims here presented fit within that exception, according to the government. In the alternative, the United States suggests that the claims lack merit.

### A. Direct Appeal Waiver and Procedural Default

As set forth in paragraph 16(a) in the plea agreement, [Doc. 342 at 17], Williams waived his right to file a direct appeal of his conviction, except as to claims that his sentence exceeded his guidelines sentence range or the mandatory minimum sentence. It is well recognized that a party may waive a provision intended for his benefit in a contract or statute. *Shutte v. Thompson*, 82 U.S. 151, 21 L.Ed. 123, 15 Wall. 151 (1872). Even fundamental constitutional rights may be waived by an accused, so long as the waiver is knowingly and voluntarily made. *Ricketts v. Adamson*, 483 U.S. 1, 10 (1987) (double jeopardy defense); *Boykin v. Alabama*, 395 U.S. 238, 243

(1969) (same, rights to jury trial and confrontation and privilege against self-incrimination); *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938) (right to counsel); *United States v. McGilvery*, 403 F.3d 361, 363 (6th Cir. 2005) (right to appeal); *Watson v. United States*, 165 F.3d 486, 489 (6th Cir. 1999) (right to collateral attack. Therefore, so long as Williams understood the terms of the plea agreement and so long as the waiver was made voluntarily and knowingly, the waiver is valid and enforceable. A review of the transcript of the plea proceedings indicates that petitioner understood the direct-appeal waiver provision and that his waiver was made voluntarily.

During those proceedings, the Court first questioned petitioner as to whether his attorney had explained all the terms and conditions of the plea agreement and whether he understood all those terms and conditions, [Doc. 848, Chg. of Plea Hr'g Tr. at 6]. Petitioner gave positive answers to those questions, [*Id*.]. After the waiver provision was summarized by the prosecutor, the Court explained that, with certain exceptions, the provision waived petitioner's right to file a direct appeal, [*Id*. at 13-14, 17]. The Court next asked Williams whether he understood that provision; whether he had read "very carefully" paragraph 16 in the plea agreement; whether he had reviewed the terms in paragraph 16 with counsel; and whether counsel and he had "fully discussed" the direct-appeal waiver in the plea agreement, [*Id*. at 13-14]. Again, all petitioner's answers to these questions were positive.

The Court then found that, based on its observations of Williams's appearance and responsiveness to the inquiries, he was in full possession of his faculties, not under the influence of any narcotics, drugs, or alcohol, was knowingly waiving his constitutional rights, and was pleading guilty knowingly and voluntarily, [*Id*. at 17-19]. Petitioner did not then and does not now challenge those findings. Therefore, because the waiver of Williams's direct appeal right in paragraph 16(a) of the plea agreement is valid and enforceable and because none of the above claims fall within the exception to the waiver, the Sixth Circuit would have enforced the waiver and

would have dismissed any direct appeal in which he pressed the aforementioned claims as grounds for relief.

Among petitioner's claims are allegations that, in connection with his sentencing guidelines calculation determining the amount of loss resulting from the chop-shop conspiracy, the Court erred in applying two additional levels for a loss of $1,000,000 to $2,500,000, whereas the actual loss was $919,435.34, as was stated in his PSR as the amount of his restitution. Had the Court used the latter figure as the loss amount, his sentence would have been increased only 14 levels, rather than the 16-level increase attached to a loss amount of $1 million to $2.5 million. Lowering his sentence by two levels would have resulted in a total offense level of 23 and a guidelines sentence of 70-87 months imprisonment, as Williams suggests should have occurred.

Other sentencing claims offered in the supplement concern an "unwarranted sentencing disparity" and the imposition of a longer sentence for petitioner than the sentences imposed on co-defendants Curtis Reed and James Sisk. (Reed and Sisk received respective prison sentences of 36-months and 66-months, [Docs. 704, 742].) In a related allegation, Williams asserts that the government's attorney engaged in deceptive plea negotiations by permitting other defendants to plead guilty to lower loss amounts than the loss amounts involved in his guilty plea. Another contention is that his guilty plea was unlawfully induced or involuntary because he knew nothing about the adjustment for his leadership role in the chop-shop offense.

Respondent relies on the doctrine of procedural default as a bar to federal review of the above-described claims. The procedural default doctrine holds that a claim not presented on appeal when it could have been presented may not be reviewed in a § 2255 motion, absent a showing of cause and actual prejudice to excuse a failure to raise the claim previously. *Bousley v. United States*, 523 U.S. 614, 619 (1998); *Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000).

The plea agreement, as noted earlier, contained a waiver provision with respect to

Williams's right to file a direct appeal. That provision limited claims which could be raised on appeal to those involving "a sentence imposed above the sentencing guideline range or any applicable mandatory minimum sentence (whichever is greater)," [Doc. 342 at ¶ 16(a)]. Because claims concerning disparities between petitioner's and his co-defendants' sentences did not fit within the excepted claims, presenting these claims on direct appeal would not have resulted in a merits review, but instead on the enforcement of the waiver provision in the plea agreement, so long as the waiver was knowing and voluntary. *United States v. Fleming*, 239 F.3d 761, 764 (6th Cir.2001) (observing that the "sine qua non of a valid waiver is that the defendant enter into the agreement knowingly and voluntarily"). The same holds true of the other purportedly defaulted claims.

The government argues that Williams's failure to appeal, regardless of the reason for the failure, means his claims are procedurally defaulted, unless he can show both good cause for not raising the claims earlier and would suffer actual prejudice if the claims are not reviewed now. *See Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000). It is undisputed that Williams has not attempted to show either. Although some of Williams's claims appear to be procedurally defaulted[4] it is not necessary for the Court to decide the issue since the Court finds, as set out below, that the claims fall within the scope of the § 2255 waiver in Williams's plea agreement.

**B. § 2255 Waiver**

The plea agreement likewise contained a waiver of Williams's statutory right to file a motion to vacate, under 28 U.S.C. § 2255, except for claims of ineffective assistance of counsel or prosecutorial misconduct not known to him by the time of the entry of judgment, [Doc. 342,

---

[4]   Williams does not address his reason for not filing a direct appeal except to say that he did not appeal because he "was unaware of the severity of ineffective assistance of counsel" or that he "had a right to appeal." Regardless of whether the direct appeal waiver played any part in the decision of Williams not to file a direct appeal, the result is the same—he did not seek to raise his claims on direct appeal. While the Sixth Circuit *might* have refused to review the claims because of the waiver, we will never know because Williams did not file a notice of appeal. Of course, in the Sixth Circuit, claims of ineffective assistance of counsel are generally not raised on direct appeal.

¶16(b)]. During the change-of- plea proceedings, the Court similarly explained to petitioner the §

2255 waiver provision in the plea agreement and made the same inquiries of petitioner concerning

petitioner's understanding of the § 2255 waiver as were made in connection with the direct appeal

waiver. Likewise, Williams gave the same positive responses to those inquiries, indicating that in

each instance he understood the § 2255 waiver provision in the plea agreement. There is nothing

to indicate otherwise in the record or in anything alleged by petitioner. It is well settled that a

waiver of § 2255 claims is enforceable. *Davila v. United States*, 258 F.3d 448, 450 (6th Cir.

2001). The Court finds that the waiver of Williams's right to file a § 2255 motion, as set forth in

paragraph 16(b) of the plea agreement, was made knowingly and voluntarily and that, hence, it is

valid and enforceable. This next logical step is to determine whether the ineffective assistance

claims fall within the scope of the § 2255 waiver.

The government maintains that the remaining claims fall squarely within the waiver

provision, in that petitioner does not premise his claims on any allegation of ineffective assistance

of counsel or prosecutorial misconduct not known to him at the time of the entry of his judgment.

Petitioner does not argue that his ineffective assistance claims fall outside the scope of the waiver.

*See United States v. Sharp*, 442 F.3d 946, 951 (6th Cir. 2006) (noting that an "appellate-waiver

provision [is] enforceable where 'there [was] nothing in the record to suggest that ... the defendant

misunderstood the scope of his waiver of appellate rights'-essentially requiring the defendant to

affirmatively establish his misunderstanding") (quoting *McGilvery,* 403 F.3d at 363).

After reviewing those claims, the Court agrees that Williams would have known of the

actions or inactions now claimed as instances of ineffective assistance before the judgment

entered in this case. Accordingly, since petitioner's ineffective assistance claims are not covered

by any of the grounds for § 2255 relief reserved by him in the plea agreement, he has waived his

right to bring these claims in this collateral review proceeding.

19

## V.    Conclusion

For the reasons set forth above, Williams' valid waiver of his right to file a motion to vacate, raising the instant claims, forecloses § 2255 relief, and, thus, his § 2255 motion will be **DENIED WITH PREJUDICE** and this case will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability (COA) should petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a § 2255 case only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). A petitioner, whose claims have been rejected on the merits, satisfies the requirements of § 2253(c) by showing that jurists of reason would find the assessment of the claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A petitioner whose claims have been rejected on a procedural basis, as is the case here, must demonstrate that reasonable jurists would debate the correctness of the Court's procedural ruling. *Id.; Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001). The District Court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Murphy v. Ohio*, 263 F. 3d 466, 467 (6th Cir. 2001).

The Court has individually assessed petitioner's claims under the relevant standards and finds that those claims do not deserve to proceed further because they have no viability in light of the governing law. Thus, jurists of reason would not conclude the disposition of those claims was debatable or wrong. Because petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA will not issue.

A separate judgment order will follow.

**ENTER**:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE